*406
 
 O’NIELL, Chief Justice.
 

 This is an injunction suit to prevent the sale of 44.23 acres of land, which the plaintiff, Louis Joseph Peterman, bought from Homer E. Johnson, and which was once a part of Johnson’s Eruitland Plantation. The plantation was seized by the sheriff at the instance of the Vermont Savings Bank, in executory proceedings against Johnson, on a mortgage note for $16,000. Peterman, before buying the 44.23 acres of land from Johnson, employed an attorney to examine the title, and he, finding the $16,000 mortgage on record, had it canceled in so far as it affected the 44.23 acres. The question in the case is Whether a certain telegram, purporting to authorize the cancellation, was a genuine telegram sent by the bank. The district judge decided that the telegram was not genuine, or not sent by the bank, and hence that the cancellation of the mortgage was not legal. The judge therefore dissolved the writ of injunction, and ordered Peter-man’s 44.23 acres of land sold as a part of the land affected by the bank’s mortgage. The judge, however, allowed Peterman $2,-275.58, as part of an alternative demand which he made in his answer to the suit, for buildings and improvements which he had put upon the land. Peterman has appealed from the judgment rendered against him, and the bank has appealed from the judgment allowing Peterman the $2,275.58.
 

 Eruitland Plantation, having an area of 377.02 acres, is in Rapides parish, of which Alexandria is the parish seat. The mortgage on the plantation was given by Johnson in September, 1928, to secure a loan made by the Security Mortgage Company, in Alexandria. When the attorney for Peter-man, in his examination of the title, discovered the mortgage on record, he called upon H. M. Mclver, president of the Security Mortgage Company, and requested that the mortgage should be canceled from the 44.23 acres, on Johnson’s making a partial payment on the loan. Mclver informed Peter-man’s attorney that the mortgage note for $16,000 had been sold to the Vermont Savings Bank, in Brattleboro, Vt., but that the Security Mortgage Company was the agent for the bank, for the servicing of this and other loans which the company had negotiated with the bank — e. g., attending to the payment of taxes on the lands, collecting of interest, etc. The Security Mortgage Companyxhad authority not only to collect interest on the mortgage notes held by the Vermont Savings Bank, but also to receive payments of principal, in multiples of $100, on the dates on which interest was payable. Johnson therefore proposed to pay, in consideration for a release of the 44.23 acres from the mortgage, $1,500 as a partial payment on the mortgage note of $16,000, out of the price which he was to receive' from Peterman. The Security Mortgage Company was willing to accept the payment and release the 44.23 acres from the mortgage; but the attorney for Peterman insisted that the Security Mortgage Company, or some officer of the company, should have special authority from the Vermont Savings Bank to cancel the mortgage from the 44.23 acres of land. Therefore George A. Burton, who was secretary-treasurer of the Security Mortgage Company, sent a telegram to H. G. Root, in Rutland, Vt., who was the mortgage company’s representative there, and who repre
 
 *408
 
 sen ted also several banks in Vermont, to whom the mortgage company had sold notes secured by mortgages on lands in Louisiana; in which telegram Burton asked Root to obtain authority to release the 44.23 acres (supposed to be 40 acres) from the mortgage. Burton’s telegram, dated September 24, 1928, and addressed to H. G-. Root, Rutland, Vt., was in these words: “Advise if forty acres can be released from Johnson Sixteen thousand with payment of fifteen thousand.” Burton immediately discovered the error of saying “fifteen thousand” instead of “fifteen hundred,” and on the same day he corrected the error by sending another telegram to Root saying: “Error in first telegram. Can forty acres be released for fifteen hundred?” Eight days later, that is, on the 2d day of October, 1928, the Security Mortgage Company, in Alexandria, La., received a telegram of that date, sent from Brattleboro, Vt., addressed to H. M. Mclver, Security Mortgage Company, Alexandria, La., and signed “Vermont Savings Bank,” saying: “BURTONS •WIRE ROOT RUTLAND REFERRED US SATISFACTORY RELEASE FORTY JOHNSON LOAN IF YOU CONSIDER SUFFICIENT ACCORDING LOCATION ENDEAVOR GET FORTY PER ACRE.” We have copied this telegram literally from the original, which is in the record, on a Western Union form. The exact meaning of the telegram, as explained by the testimony and admitted by the parties, is this: “Burton’s wire [to] Root [at] Rutland [has been] referred [to] us. [It is] satisfactory [to] release forty [acres of the land mortgaged to secure the] Johnson lo'an if you consider [the payment of $1,500] sufficient according [to the] location [of the 40 acres]. Endeavor [to] get [a payment of] forty [dollars] per acre.”
 

 The fact that the tract of 44.23 acres is referred to in the telegrams as having an area of only 40 acres is not considered important or complained of in this suit. The exact area of the tract was not determined or determinable until a survey was made, because the tract formed a corner of Fruitland Plantation and was bounded on the south and west side by a bayou, Bayou Rapides, the meander line of which had to be traversed. The exact area within the lines of the survey is only 37.9 acres, but the area between the traverse of the bayou and the water’s edge adds 6.33 acres, making the total area 44.23 acres, extending to the water’s edge. Perhaps the reason why there is no complaint of the fact that the area which was released from the mortgage was (including the narrow areas between the traverse of the bayou and the water’s edge) 4.23 acres more than it was said to be in the telegrams is that the only valuable area is the 37.9 acres within the lines of the survey.
 

 On receipt of the telegram from Brattleboro, H. M. Mclver, as agent for the Vermont Savings Bank, signed a release of the mortgage, in so far as it affected the 44.23 acres which Johnson was to sell to Peter-man; and the clerk of the district court, ex officio recorder of mortgages, made the cancellation, by recording the instrument signed by Mclver, in Mortgage Book 141, folio 278, and by inscribing the cancellation on the face of the record of the original mortgage, with the notation: “For authority for partial release hereof see Mortgage Book 141,
 
 *410
 
 folio 278.” Thereupon Peterman, on the advice of his attorney, bought the 44.23 acres of land from Johnson, and he paid to Mclver, as agent for the Vermont Savings Bank and president of the Security Mortgage Company, $1,600, as a credit on Johnson’s mortgage note of $16,000. Mclver, or the Security Mortgage Company, did not remit the $1,600 to the Vermont Savings Bank. The Security Mortgage Company afterwards became insolvent, and, at the time of the trial of this suit, in February, 1933, Mclver and Burton and the other officers of the company were under indictment for embezzlement.
 

 The officers of the bank say that they had' no knowledge of the cancellation of the mortgage from the 44.23 acres of land, or of the collection of the $1,600 by Mclver or the Security Mortgage Company, until 1930. In October or November of that year, the president of the bank, having been informed of the collection, came to Louisiana, and, having investigated the transaction, notified Peterman that the bank would disregard the cancellation of the mortgage on his 44.23 acres of land in the event of a foreclosure of the mortgage securing the bank’s note for $16,000. Thereafter Johnson defaulted on his note,' and in 1932 the bank brought the foreclosure proceedings which provoked this injunction suit.
 

 It is well settled, and is not disputed, that a mortgage cannot be canceled to the prejudice of the holder of a promissory note secured by the mortgage, except with his consent or by a judicial proceeding against him. Dreux, Executor, v. Ducournau, 5 Mart. (O. S.) 625; Lafarge v. Morgan, 11 Mart. (O. S.) 462, 527; Macarty v. Landreaux, 8 Rob. 130; Hennen v. Sewell, 8 Rob. 216; Delavigne v. Gaiennie, 11 Rob. 171, 173; Mrs. De St. Romes v. Widow Blanc, 20 La. Ann. 424, 96 Am. Dec. 415; Horton v. Cutler, 28 La. Ann. 331; Mechanics’ Building Association v. Ferguson, 29 La. Ann. 548, 550; Morris v. Cain’s Executors, 34 La. Ann. 657, 665; Levy v. Desposito, 133 La. 126, 62 So. 599; Gallagher v. Conner, 138 La. 633, 70 So. 539; Fisher v. Trimble, 161 La. 343, 108 So. 666; Freeland v. Carmouehe, 177 La. 395, 148 So. 658.
 

 But the evidence in this case convinces us that the telegram purporting to authorize H. M. Mclver to have the bank’s mortgage canceled in so far as it affected the 44.23 acres of land which Johnson sold to Peter-man was genuine; that is to say, that the telegram was sent by some officer of the bank, in Brattleboro, Vt., having authority to send it. The original telegram in the refcord has the appearance of a genuine telegram re: ceived at the Western Union office in Alexandria, La., from Brattleboro, Vt. The local chief operator, who held that position on the date which the telegram bears, and the local manager, who held that position on the date which the telegram bears, testified that, in their opinion, the telegram was genuine. They explained that the original message which was delivered by the sender to the office in Brattleboro, Vt., could not be produced because a rule of the telegraph company required that all telegrams should be destroyed when they reached the age of one year. But the testimony of these witnesses leaves no doubt whatever that the instrument which was filed in evidence in this case represents exactly what the telegraph operator received
 
 *412
 
 over the wire in Alexandria on the 2d day of October, 1928. The witnesses explained that the form on which this telegram is written is used exclusively by telegraph operators, receiving telegrams, and is different from the forms used by the public for sending telegrams. The witnesses testified that the forms used by telegraph operators for receiving telegrams from the telegraph instruments, like the form on which this telegram is written, are not allowed to go out of the office. The witnesses identified the rubber stamp, “Alexandria, La.” on the telegram, as being made by the stamp in their office; and they explained the symbols, such as “91NS V 22”. The figure “91” meant that that was the ninety-first telegram received by the office that day; the “NS” indicated that the message was relayed through New Orleans ; the letter “V” was the initial of the operator who received the telegram; and the number “22” was the number of words in the telegram. Although the attorneys for the bank, on the trial of the case, undertook to cast doubt upon the genuineness of the telegram, the record leaves no doubt whatever about it. The most important information which the chief operator and the local manager of the telegraph office gave was that the telegraph company furnished to banks peculiar forms for sending telegrams, different from, the forms furnished to the public generally, so that a telegraph office would not accept for transmission, without inquiry, a telegram purporting to be signed by a bank, unless it was on one of the peculiar forms used by banks. That testimony contradicts the suggestion made by the attorneys for the bank, that perhaps Mr. Root, who resided at Rutland, which is said to be about 70 miles from Brattleboro, or perhaps one of the officers of the Security Mortgage Company in Alexandria, La., went to Brattleboro, Vt., and fraudulently answered, in the name of the Vermont Savings Bank, the telegram which-Burton had sent from Alexandria to Root in Rutland. There is evidence in this record also that Root referred the matter to the president of the Vermont Savings Bank, when Root received the telegram from Burton, asking for a release of 40 acres of land from the bank’s mortgage. The evidence is contained in a letter which Root wrote to the president of the bank, on the 4th of December, 1930, when the president of the bank was investigating the matter. In his letter Root said to the president of the bank:
 

 “I enclose herewith letter from Gus A. Volz [who was Peterman’s attorney] and my original reply, which, if satisfactory, I wish you would send to him. There is absolutely nothing in my files from you stating that you would release anything whatsoever. You probably told me over the phone that you would release the 40 acres provided you got the money, but the wording of my telegram is 'plain. If this letter of mine is not satisfactory you could wnte to Mr. Voltz and tell him that I had turned back my files to you, and then I could send them to you.”'
 

 The president and the treasurer and five trustees of the Vermont Savings Bank testified, by depositions taken under commission in Vermont, that they had no knowledge, and that the bank had no record, of the telegram received by H. M. Mclver, in Alexandria, La., on the 2d day of October, 1928, purporting to
 
 *414
 
 authorize the cancellation of the bank’s mortgage from 40 acres of the mortgaged land. These witnesses admitted, however, that the assistant treasurer of the bank, as well as either the president or the treasurer of the bank, had authority to authorize a cancellation of the mortgage. The assistant treasurer was not called upon to testify for the bank; and no witness offered any explanation as to why the testimony of the assistant treasurer was not sought by the bank. Whether he sent the telegram, or some other officer of the bank sent it and forgot the incident is a matter of conjecture. It is sufficient to say that the preponderance of the evidence is that some one in authority sent the telegram for the bank. An important item of evidence in that respect is that, in 1929, and again in 1930, Johnson paid to the Security Mortgage Company, and. the bank received from the company, interest on only $14,400, being the balance due on the $16,000 loan after Johnson had paid the $1,600 out of the price which he received from Peter-man for the 44.23 acres of land. The president of the hank, in his depositions, denied that the officers of the bank had any knowl-. edge of Johnson’s having paid the $1,600 on his loan, until October, 1930; but, in answering a cross-interrogatory, he remembered that the amount of interest which Johnson paid in 1929 and in 1930 did not account for interest on the'whole $16,000, but accounted for interest on only the balance, $14,400. The only explanation that the president of the bank gave for his failure to inquire into the shortage in the interest payment was this: “It is a fact, but we assumed that Johnson had made only a partial payment of interest due on the full amount loaned.” Our opinion is that the bank officials would have inquired into the matter if they had believed that the interest payment which Johnson made in 1929, and again in 1930, was only a partial payment of the interest due on the whole debt, instead of being a payment in full of the interest due on the unpaid balance of the debt. Our conclusion, therefore, is that the bank officials did know that Johnson had paid $1,600 on his loan; and, from all of the facts and circumstances of the case, our conclusion is that the bank authorized the sending of the telegram, giving Mclver authority to cancel the mortgage on the 44.23 acres of land, in consideration-for the partial payment of $1,600 on the $16,000 loan.
 

 A document purporting to be a telegram received by a telegraph operator and translated by him. from the Morse code is only a copy of the original instrument signed by the sender; hut such a copy is admissible in evidence when proof has been made that the original telegram, signed by the sender, if ever it existed, must have been destroyed. In such a case, the question whether the telegram was in fact signed and sent by the party whose signature it purports to bear is a question of fact, to be determined by oral testimony, and by all of the relevant circumstances. In People v. Hammond, 132 Mich. 422, 93 N. W. 1084, it was held:
 

 “Where it was shown by parol that witness had sent a telegram to defendant, and had received what purported to be an answer thereto, and that the original telegrams had been destroyed by the company before trial, the answer was admissible in evidence with
 
 *416
 
 out direct proof that it was sent by defendant.”
 

 To the same effect was the ruling of the Supreme Court of South Dakota, in Western Twine Company v. Wright (1899) 11 S. D. 521, 78 N. W. 942, 44 L. R. A. 438, viz.:
 

 “A telegram received from a telegraph operator, which purports to be in reply to one which the recipient had previously deposited with the operator, with charges prepaid and properly addressed, is admissible in evidence .against the person by whom it purports to have been sent, without any proof that he actually executed or authorized such despatch, or that it was ever transmitted.”
 

 The objection to such evidence has reference not to its admissibility, but to its sufficiency or effect. In Lundgren v. Union Indemnity Co., 171 Minn. 122, 213 N. W. 553, 52 A. L. R. 580, the Supreme Court of Minnesota, after saying that a telegram, when offered in evidence, like any other document offered in evidence, had to be authenticated, said:
 

 “But a telegram is sufficiently authenticated, prima facie, when, from its contents and ■other circumstances in evidence, it can be reasonably inferred that the author of the message is the person sought to be charged or another lawfully acting for him.”
 

 In Menefee v. Bering Manufacturing Co., 166 S. W. 365, the Court of Civil Appeals of Texas went so far as to say:
 

 “A telegram received by a party in response to a letter addressed and mailed to the adverse party is properly received in evidence as against the adverse party who purported to have signed the telegram without other evidence that he had signed it except that disclosed by the face of the telegram, where the original telegrams of the company transmitting them had been destroyed persuant to orders of the Interstate Commerce Commission.”
 

 -Decree.
 

 The judgment appealed from is annulled., the writ of injunction which was issued in this case is perpetuated, and the sheriff is ordered to release from seizure the 44.23 acres of land bought by the plaintiff, Louis Joseph Peterman, from Homer E. Johnson, on the 4th of October, 1928, which land is now adjudged to be free from the mortgage of the defendant Vermont Savings Bank. The bank is to pay all costs of this suit.