[Civ. No. 19215. Second Dist., Div. Three. Mar. 4, 1953.]

HOUSE GRAIN COMPANY (a Corporation), Respondent, v. FINERMAN & SONS et al., Appellants.

Horton & Knox and Schwartz & Alschuler for Appellants.

J. G. Moser, Daniel A. Weber and Leonard Cohen for Respondent.

VALLÉE, J.—Plaintiff brought this action against Finerman & Sons and George Finerman for damages for breach of contract for the sale of barley. The cause was tried by a jury which returned a verdict for plaintiff. Finerman & Sons and George Finerman appeal separately from the resulting judgment.

Plaintiff is a corporation. Newton House is its owner, president, and general manager. All transactions on behalf of the corporation were handled by House and by P. O.

Palmer who was employed by House as a buyer and seller of grain and was authorized by him to sign purchase contracts. Defendant Finerman & Sons is a partnership consisting of Harry Finerman, Mary Finerman, his wife, Melvin Finerman, his son, and Edith Root, his daughter. Harry Finerman is the managing agent of the partnership. Defendant George Finerman, not a member of the partnership, is a brother of Harry Finerman. Al Kalin is a grain buyer in the Imperial Valley.

On February 20, 1950,[1] plaintiff and defendants entered into a written contract whereby defendants agreed to sell to plaintiff and plaintiff agreed to buy the yield from 1,100 acres of barley growing in Imperial Valley at $1.92½ per cwt. to be delivered during May and the first half of June, f.o.b. Brawley, California. On February 28th, the contract was amended in writing, whereby the commitment was changed to 1,600 tons. At that time defendants knew that plaintiff, in reliance on the contract, had contracted for the resale of the barley to Al Kalin at Brawley at $1.97½ per cwt. Defendants refused to deliver any barley to plaintiff by reason of which it was unable to deliver to Kalin. Plaintiff paid Kalin $16,800 in satisfaction of its liability to him. Plaintiff alleged damage (1) this sum of $16,800; (2) loss of $1,600 profit, being the difference between the price at which defendants agreed to sell the barley to plaintiff and the price at which Kalin agreed to buy it from plaintiff; (3) interest on the $16,800 paid Kalin and on the $1,600 loss of profit, amounting to $1,717; total damage of $20,117. The verdict and judgment were in that amount.

The partnership owned about 900 acres of land in Imperial Valley on which barley was being grown at the time the contract was executed. There were about 200 acres adjoining the 900 acres on which barley was also being grown owned by George Finerman and an associate who lived in Chicago. The 1,100 acres were farmed by the partnership. The contract of February 20th and the modification in February 28th were made by George Finerman on behalf of himself and the partnership. There was no writing authorizing George to act for the partnership. Plaintiff tried its case on the theory, and the jury necessarily found, that George was the ostensible agent of the partnership in the transaction.

1. The partnership's first assignment of error is that the

---

[1] All dates refer to the year 1950 unless otherwise indicated.

court erred in permitting plaintiff to file an amended complaint without requiring it to plead the facts on which it relied to create an ostensible agency. The amended complaint pleaded that the contracts were made with the principal. ■ "Where a pleading alleges a contract according to its legal effect, which may be done under our system (*Stoddard* v. *Treadwell*, 26 Cal. 294, 303), the contract, if it is executed by an agent duly empowered, may be pleaded as if it were the contract of the principal, without mentioning the agency. (31 Cyc. 1626.) In such case the execution, if denied, may be sustained by proof of signing and delivery by the agent, supported by proof of his authority." (*McGibbon* v. *Schmidt*, 172 Cal. 70, 73 [155 P. 460]. See also *Simpson* v. *Bergmann*, 125 Cal.App. 1, 9 [13 P.2d 531].) Without objection, the theory on which the cause was tried as between plaintiff and the partnership was whether George was the ostensible agent of the partnership. The partnership has not shown that it was in any way prejudiced by the ruling of the court. (*Mountain States Creamery Co.* v. *Tagerman*, 39 Cal.2d 355, 357 [246 P.2d 21].)

■ 2. The partnership's next assignment of error is that the evidence was insufficient to establish an ostensible agency. About the middle of February, Harry Finerman, in George Finerman's house, asked George to look up the names of grain brokers. George did, and gave him the name of House. Harry telephoned House in the presence of George and told him he and his brother had some ranches in the Imperial Valley on which they raised about 1,100 acres of barley which would produce about two tons to the acre. Harry asked House whether he was interested in buying the barley. House replied that he was, and Harry asked him the market price. House said it was around $1.90 in the Imperial Valley. Harry asked him if he could get a little better bid, said that he wanted around $1.92½, and that he would sell at that figure. House said he would try. Harry told him to get the bid, to call him back at George's home, and gave him the telephone number. Later the same day House telephoned Harry at George's home. House told Harry he had contacted his buyers and that he could pay him $1.90. Harry said that was not enough. House testified: "I asked him what his ideas were and he said $1.92½, and if I could get that price, either call him or call his brother George and work out the deal." Palmer testified that in this conversation Harry said to House: " 'Well, see what you can do with

it, and if anything comes up in the next few days or a week, why call George because he will handle the deal up here for me.' ''

On February 20th, George telephoned to House and told him that ''he had talked to his brother, Harry Finerman, and they had not sold their barley in the Imperial Valley and wanted to know if we were still interested in the barley at $1.92½, and I told him that I would again contact my buyers and see if they were still interested in it.'' George replied: ''Go ahead.'' House telephoned Kalin who said he would take the barley as $1.97½. The same day, House called George back and told him ''I could use the barley at $1.92½.'' George replied, ''O.K., it's sold, the entire acreage of 1100 acres grown in Imperial Valley.'' House then said to George: ''Well, I will send a confirmation to you at Finerman & Sons, confirming it, and you read it and talk it over with your brother and answer it by return wire.'' House then telegraphed as follows:

''1950 FEB 20

FINERMAN & SONS==
 5111 FRANKLIN AVE LOSA (ST)==

THIS WILL CONFIRM PURCHASE OF THE ENTIRE YIELD FROM 1100 ACRES OF BARLEY NOW GROWING ON YOUR RANCHES IN IMPERIAL VALLEY AT $1.92 1/2 PER CWT BULK FOB CARS OR BULK DELIVERED BRAWLEY BY TRUCKS BUYERS OPTION MAY FIRST HALF JUNE 1950. THIS BARLEY SHALL GRADE# 2 46# OR BETTER DOCKAGE OVER 1% DEDUCTIBLE AND IS TO BE FREE FROM MELILOTOUS INDICA (SOUR CLOVER)==

HOUSE GRAIN CO.''

And George telegraphed as follows:

''1950 FEB 20

HOUSE GRAIN CO==
 124 WEST 4TH ST LOSA (HL)==

THIS WILL CONFIRM SALE 1100 ACRES IMPERIAL BARLEY MAY AND FIRST HALF JUNE DELIVERY AT $1.92 1/2 FOB BRAWLEY==

GEORGE FINERMAN''

On February 20th, upon receipt of the telegram from George, House sent a purchase confirmation to Finerman & Sons at George's address, and a sale confirmation to Kalin, covering the named crop. On February 24th, a signed copy of the latter confirmation was returned to House, signed ''accepted'' by Kalin. On February 21st or 22d, George read to Harry on the telephone the contents of the House-to-Finerman telegram of February 20th, confirming the sale

of 1,100 acres of Finerman barley. Harry did not raise any question about the sale. On February 26th or 27th, House sought out Harry in El Centro "to see the barley that I bought." Harry then told House that he had sold the barley to one Hartzog. House showed Harry the telegram which House had received from George on February 20th and said that he (House) had resold the barley, that since he had "a named crop" the sale to Hartzog put him "in an awful position to deliver the named crop of barley to my buyer, who was Mr. Kalin," and threatened legal action unless he received the barley. The sale to Hartzog was not of a named crop, but was of 1,300 to 1,500 tons of "Imperial" barley. After some discussion and a telephone conversation from Harry to George, Harry told House he was going to have quite a bit more barley than he had sold, that he estimated the barley yield would be two tons or more to the acre. The next day Harry took House out to see the barley, and at Harry's suggestion they "agreed on 1600 tons," i.e., House would accept 1,600 tons instead of the yield from the Finerman 1,100 acres because this "would make it very easy for them to fulfill" both commitments. House told Harry he would have to get the consent of Kalin. House then contacted Kalin who agreed to the change. On February 28th, Palmer sent a purchase confirmation to Finerman & Sons at George's home in Los Angeles, confirming purchase of 1,600 tons at $1.92½ per cwt. in lieu of the yield from 1,100 acres, which contained the following: "Please sign and return for our files." A few days later the confirmation was returned to plaintiff's office in the mail, and it was filed by its office secretary. The part "& Sons" in the name "Finerman & Sons" bore a line through it and the name "Geo." was inserted before the name "Finerman," and it bore the signature of "George Finerman." House did not see the changes until June 11 or 12 when he took the papers concerning the transaction to his attorney. Notwithstanding demands made by plaintiff on defendants for delivery of the barley, none was delivered.

Civil Code, section 2300 reads: "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Section 2315 reads: "An agent has such authority as the principal, actually or ostensibly, confers upon him." Section 2317 reads: "Ostensible authority is such as a principal, intentionally or by

want of ordinary care, causes or allows a third person to believe the agent to possess." Section 2334 reads: "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." ▮ The issue of ostensible agency is one of fact. (*Henry Cowell Lime & Cement Co.* v. *Santa Cruz County Nat. Bank,* 82 Cal.App. 519, 522 [255 P. 881].) ▮ The evidence was such as to warrant the jury in concluding that Harry Finerman, either intentionally or by want of ordinary care, caused House reasonably to believe George Finerman to be the agent of the partnership, and that House in good faith and without want of ordinary care incurred the liability to Kalin upon the faith thereof.

3. The court, over the objection of the partnership, admitted in evidence the telegram of February 20th from George to House. No objection was made by George. The partnership assigns error. The argument is that the telegram was not admissible because there was no proof George sent it nor proof of his handwriting; that it was sent by one Borut, who it appears from the evidence was a business associate of George; and that George testified he did not send it. House testified that in the course of the telephone conversation he had with George on February 20th, he told George he would send him a telegram confirming the terms and conditions of the sale and asked him to send a similar confirming telegram back to House. When House finished Palmer took the telephone and told George some . of the language to be incorporated in the telegram. In the course of the conversation House had with Harry on February 27th, House showed Harry the telegram. Harry did not question its authenticity.

The telegram was sent in response to the one sent by House to George. The fact that the two telegrams may have crossed in transmission does not alter the fact. ▮ It is settled that a telegram received in reply to a telegram addressed to the sender is presumed to be genuine, and is admissible in evidence without further proof of the identity of the sender. A reply-telegram authenticates itself. (*People* v. *Hammond,* 132 Mich. 422 [93 N.W. 1084, 1085-1086]; *Western Twine Co.* v. *Wright,* 11 S.D. 521 [78 N.W. 942, 943-944, 44 L.R.A. 438]; *Peterman* v. *Vermont Sav. Bank,* 181 La. 403 [159 So. 598, 602]; VII Wigmore on Evidence,

3d ed. 614, § 2154; 32 C.J.S. 608, § 706b; 20 Am.Jur., Evidence, §§ 195, 963.) The question of the genuineness of the telegram was for the jury. There was no error in admitting it in evidence.

 4. The next assignment of error is that the court erred in overruling an objection of the partnership to conversations had between House and Harry Finerman after House had entered into the contract with Kalin. It is argued that no evidence was admissible to prove an ostensible agency after House had made the contract of February 24th with Kalin. There was no error. Any act, declaration, or conduct of Harry which the jury could reasonably construe as an admission that an ostensible agency had been created, was admissible whether it occurred before or after House made the contract with Kalin.

 5. The defendants assign error because of the admission in evidence over objection of the House of Kalin check for $16,800. The argument is that evidence of the payment to Kalin was self-serving and not shown to have been the proximate result of the breach of the contract. The check was admissible. As we have said, the jury could reasonably conclude from the evidence that House believed George was the agent of the partnership and that he (House), in good faith and without want of ordinary care, incurred a liability to Kalin upon the faith thereof. Plaintiff was entitled to prove the amount of the liability incurred and paid. Whether the amount paid was reasonable under the circumstances was a question for the jury.

 6. The partnership's next assignment of error is that the court did not adequately define an ostensible agency in its instructions. The court gave the instruction set out in the margin.[2] The contention is that neither this nor any other instruction advised the jury that in reliance on the ostensible authority plaintiff must have incurred a liability

[2] "If you should find from the evidence that defendant Harry Finerman, in furtherance of the business of Finerman & Sons, held out George Finerman to the plaintiff as being authorized by the partnership of Finerman & Sons to act as its agent in carrying out the transactions in suit, and that in reliance upon such holding out on the part of Harry Finerman the plaintiff was induced to and did believe that George Finerman had such authority to bind the partnership of Finerman & Sons, and that in reliance thereon the plaintiff entered into such transactions with George Finerman, then the partnership of Finerman & Sons would be estopped and precluded from denying that George Finerman was authorized to act on its behalf in such transaction or transactions; and the acts of George Finerman as such agent and within the

or parted with value. The subject was adequately covered. The jury was told that "where a buyer has entered into a contract to resell the goods and the seller knows of the existence of such commitment on the part of the buyer to such third party, and that the seller's breach or failure to deliver such goods to the buyer will, as a direct and proximate result, disable the buyer from fulfilling the buyer's obligation to deliver such goods to the third party, and subject the buyer to liability to the third party in consequence of the buyer's inability to make good his commitment to the third party, then the buyer is entitled to recover the amount of his liability to the third party or such actual payment as the buyer may have reasonably made in good faith in satisfaction and discharge of his liability to the third party."

7. The court declined to give the following instruction requested by the partnership: "In determining whether or not an ostensible agency existed in this case, you are instructed that the plaintiff is not entitled to rely on the statements of the supposed agent nor the results of the plaintiff's own investigation, if any. If plaintiff did not know of any facts giving color of authority to George Finerman but relied wholly on the statements of George Finerman as to the existence of his authority and the results of plaintiff's own investigation, plaintiff may not recover from defendant Finerman & Sons even though facts actually existed which had plaintiff known them would have justified belief in the existence of the authority." Error is assigned. There was no error. The ostensible agency was not established by the acts, declarations, or conduct of George, the agent, but by the acts, declarations, and conduct of Harry, the principal. There was no evidence that House made any investigation of George's authority to act for the partnership.

8. The court, at the request of plaintiff, gave an instruction which the partnership says told the jury in effect that if they should find there was an actual agency George had authority to enter into a contract on behalf of the partner-

scope of his authority as so held out, would be binding on Finerman & Sons. You are instructed that there are three requirements necessary before recovery may be had against a principal for the act of an ostensible agent. A person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; such belief must be generated by some act or neglect of the principal sought to be charged; and the third person in relying on the agent's apparent authority must not be guilty of negligence."

ship. The instruction is set out in the margin.[3] The instruction is not subject to criticism. It neither assumes an actual agency nor does it assume that George was acting within the scope of his authority. The court in other instructions specifically related this instruction to the facts of this case and to an ostensible agent, if the jury found George to be such.

The partnership also apparently claims the court erred in not giving instructions proffered by it on actual agency. Since the case was tried on the theory of ostensible agency, and since the parties agree there was no evidence of actual agency, it was not error to refuse these instructions. ▮▮▮ It is not error to refuse to instruct the jury on an issue which is not developed by the evidence. (*Popejoy* v. *Hannon*, 37 Cal.2d 159, 166-167 [231 P.2d 484].)

9. Defendants contend the court erred in its instruction on the question of damages. The court gave the instruction set out in the margin.[4] Defendants assert the court should have

---

[3] "Where a plaintiff enters into a contract with the agent of a third party and the contract is signed in the name of such agent, and the plaintiff knows the agent to be acting for and on behalf of said third party in making such contract; and the agent, in entering into said contract, is acting within the scope of his authority, such contract in legal effect is the contract of the third party for whom said agent was acting and the plaintiff may hold said third party liable on such contract. Where, however, the circumstances surrounding the transaction or the terms of the contract or the two combined show an intent on the part of the plaintiff to accept the agent alone as the party liable under such contract, and not such third party, then in such case the plaintiff is deemed to have made an election to accept the agent alone as the contracting party. But if you find it to be a fact that there was no such election or intent on the part of the plaintiff to accept the agent alone as the party liable on the contract and that the contract made in the name of the agent was entered into by the plaintiff knowing the agent to be acting for and on behalf of a particular person or entity and within the scope of the agent's authority. then and in that event such person or entity for whom the agent is acting is bound by the act or contract of the agent."

[4] "Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver.

"Where the seller has committed a breach of his contract in failing to make delivery of the goods to the buyer, and the buyer is unable to obtain such goods in the open market, or there is absent an available market for the procurement thereof, the measure of damages is the loss directly and naturally resulting in the ordinary course of events from the seller's breach. Where a buyer has entered into a contract to resell the goods and the seller knows of the existence of such commitment on the part of the buyer to such third party, and that the seller's breach or failure to deliver such goods to the buyer will, as a direct and proximate

told the jury that the only measure of damages, if they found for plaintiff, was the difference between the contract price and the market price of the barley at the time of the refusal to deliver. George did not file an opening brief. By letter he adopted the opening brief of the partnership insofar as it is applicable to his case. In its opening brief the partnership conceded there was a "definite conflict" in the evidence concerning the availability of barley during May and the first part of June. George filed a reply brief in which he contends there was no conflict.

Section 1787 of the Civil Code provides: "(1) Where the property in the goods has not passed to the buyer, and the seller wrongfully neglects or refuses to deliver the goods, the buyer may maintain an action against the seller for damages for nondelivery. (2) The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract. (3) Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver." In the absence of an available market, the measure of damages is the loss directly and naturally resulting in the ordinary course of events from defendants' breach. (*Walpole* v. *Prefab Mfg. Co.*, 103 Cal.App. 2d 472, 481 [230 P.2d 36].) When there is an available market, the measure of damages is generally the difference between the contract price and the market price as stated in section 1787. Whether there was an available market, and whether, if there was not, a particular loss directly and naturally resulted in the ordinary course of events from defendants' breach, are questions of fact. (*Walpole* v. *Prefab Mfg. Co., supra,* 490.) Defendants correctly conceded in the opening brief that there was a conflict in the evidence on the question of availability of barley. No purpose would be served in relating the evidence which supports the implied finding

result, disable the buyer from fulfilling the buyer's obligation to deliver such goods to the third party, and subject the buyer to liability to the third party in consequence of the buyer's inability to make good his commitment to the third party, then the buyer is entitled to recover the amount of his liability to the third party or such actual payment as the buyer may have reasonably made in good faith in satisfaction and discharge of his liability to the third party."

of the jury. ▮ Having found there was not an available market, the jury was warranted in finding that plaintiff's liability to Kalin directly and naturally resulted in the ordinary course of events from defendants' breach of the contract. (*O'Connell* v. *Main Etc. Hotel Co.*, 90 Cal. 515, 520-521 [27 P. 373].) Further, the court instructed the jury that it was the duty of the buyer to use reasonable diligence to minimize the damages and to make them as light as possible.

▮ 10. The court instructed the jury that if plaintiff was entitled to recover it would be entitled to the loss of profit which it would have made under the resale if such loss was the direct and proximate result of the seller's breach, provided the amount of such profit was shown with sufficient certainty. Defendants assign error. The jury was warranted in inferring from the evidence that plaintiff lost a profit of $1,600 (the difference between the contract price of $1.92½ per cwt. and $1.97½ which it would have received under the sale to Kalin), and that such loss directly and naturally resulted in the ordinary course of events from the breach of the contract. (*Walpole* v. *Prefab Mfg. Co.*, 103 Cal.App.2d 472, 481 [230 P.2d 36]; *Grupe* v. *Glick*, 26 Cal.2d 680, 690 [160 P.2d 832].)

11. Defendants assert the court erred in instructing the jury "that plaintiff was entitled to interest as an element of damages." The court did not tell the jury that plaintiff was entitled to interest. ▮ What it said was that if the the jury found plaintiff was entitled to recover and that the amount of damages recoverable was certain in amount or was capable of being made certain by calculation, plaintiff would be entitled to interest.[5] The instruction was a correct statement of the law. (Civ. Code, § 3287; *Lineman* v. *Schmid*, 32 Cal.2d 204, 209 et seq. [195 P.2d 408, 4 A.L.R.2d 1380].) Although not specifically stated, it seems that defendants also claim that as a matter of law plaintiff was not entitled to interest. Plaintiff's damage—its liability to Kalin and its

[5] "Every person who is entitled to recover damages which are certain in amount, or which are capable of being made certain by calculation, where the right to recover is vested in him upon a particular day, is entitled also to recover interest thereon from that day. Therefore, if you should find in accordance with these instructions that the plaintiff is entitled to a recovery, and that the amount of damages recoverable is certain in amount or is capable of being made certain by calculation, the plaintiff would be entitled to interest upon the amount of such damages at the rate of seven per cent (7%) per annum from the date thereof."

loss of profits—was capable of being made certain by calculation, and the right to recover was vested upon a particular date—the date of the breach. It was, therefore, entitled to interest.

12. Lastly it is urged that the court erred in denying defendant's request for special findings. ■ Whether special findings should be submitted to the jury is optional with the trial court and its ruling is not subject to review unless there is manifest a clear abuse of discretion. (*King* v. *Schumacher,* 32 Cal.App.2d 172, 183 [89 P.2d 466].) No abuse appears here.

Affirmed.

Wood (Parker), J., concurred.

Shinn, P. J., did not participate.