[Crim. No. 11480. Second Dist., Div. Three. June 21, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ANDREW MONROE DINKINS, Defendant and Appellant.

Raymond H. Miller, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard D. Huffman, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—In a trial without a jury, at which he was represented by a deputy public defender, the defendant was found to be guilty of the crime of assault with a deadly weapon. (Pen. Code, § 245.) His motion for a new trial was denied. Probation was denied and he was sentenced to be punished by imprisonment in the state prison for the term prescribed by law. He has appealed from the judgment and has attempted to appeal from the order denying his motion for a new trial, but that order is not separately appealable. (*People v. Bernhardt*, 222 Cal.App.2d 567, 571 [35 Cal.Rptr. 401].)

The contentions made on behalf of the defendant are that the evidence was insufficient to support the conviction, that the testimony given at the preliminary hearing by the person alleged to have been assaulted, Ulysses S. Oliver, who was not present at the trial, should not have been received in evidence at the trial, and that certain exhibits were introduced in violation of the defendant's constitutional rights. Reference will be made to pertinent portions of the record.

With respect to the absence of Mr. Oliver at the time of the trial, the People called as a witness James Gossett, an investigator and process server for the office of the district attorney. On June 9, 1965, having received a subpoena to be served on Mr. Oliver for his attendance at the trial on June 24, Mr.

Gossett went to 1343 South Curson in Los Angeles. No one was there and Mr. Gossett left his card. Later that day he talked to Susie Oliver who was at 3641 Sixth Avenue. Mrs. Oliver stated that she was Mr. Oliver's wife and that Mr. Oliver was probably in Alabama at an address which, Mr. Gossett said, was the "secondary" address listed on the subpoena. That address was 1264 Cleveland Avenue, Montgomery, Alabama. Mr. Gossett drafted a telegram. The message, dated June 14, 1965, was charged to the office of the district attorney and was in part as follows: "Urgent, please wire collect advising if you will be in Los Angeles Superior Court Department 106, 6-24-65, to appear as witness in Andrew Monroe Dinkins case." A reply, dated June 17, 1965, was received through Western Union, a portion thereof being: "pursuant to the advice of my doctors it is not advisable because of my physical and emotional condition to return at this time. If I can be of assistance without the necessity of a long travel I will be happy to do so. Ulysses S. Oliver."

On cross-examination Mr. Gossett testified that he made no inquiry of the telephone company or at the jails. He did not communicate with Mr. Oliver and tell him that funds would be provided for his transportation to Los Angeles by air. The witness had no knowledge as to whether the district attorney's office had funds for the transportation of witnesses.

The position of the People was that the testimony of Mr. Oliver given at the preliminary hearing was admissible under the provisions of section 686 of the Penal Code.[1] On behalf of

---

[1]Section 686 of the Penal Code is as follows: "In a criminal action the defendant is entitled: 1. To a speedy and public trial. 2. To be allowed counsel as in civil actions, or to appear and defend in person and with counsel. 3. To produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness; or where the testimony of a witness on the part of the people, who is unable to give security for his appearance, has been taken conditionally in the like manner in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, the deposition of such witness may be read, upon its being satisfactorily shown to the court that he is dead or insane, or can not with due diligence be found within the state; and except also that in the case of offenses hereafter committed the testimony on behalf of the people or the defendant of a witness deceased, insane, out of jurisdiction, or who can not, with due diligence, be found within the state, given on a former trial of the action in the presence of the defendant who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, may be admitted."

the defendant, however, it was contended that such testimony was inadmissible under the reasoning of *Pointer* v. *Texas*, 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923], with respect to the constitutional right of an accused to confront the witnesses against him. In support of that position the defendant was permitted to call as a witness Thomas Patterson, the deputy public defender who had represented him at the preliminary hearing.

Mr. Patterson testified that he saw the defendant for the first time in the 30-minute period immediately prior to the time set for the opening of the court session for the conduct of the preliminary hearing. Mr. Patterson knew nothing about the case before that time. In such an interview his practice is to find out the defendant's version of the particular offense charged and to write it down on an interview sheet which is taken to the division of the municipal court where the matter is heard. He had a further discussion with the defendant Dinkins in the division of the municipal court to which his case was assigned. His only information about any of the witnesses was what the defendant told him. He made no investigation. No defense was presented at the preliminary hearing.

On cross-examination Mr. Patterson testified that he had the opportunity of cross-examining Mr. Oliver and was not limited as to the extent of his cross-examination. He felt that what he did by way of cross-examination was what should be done under the circumstances.

The direct examination of Mr. Oliver was embodied in five pages and the cross-examination in three pages of the reporter's transcript of the preliminary hearing.

The People's motion to introduce the testimony of Mr. Oliver given at the preliminary hearing was granted over the defendant's objection, the finding of the court being that Mr. Oliver was absent from California. In the course of that testimony Mr. Oliver said that he lived at 1264 Cleveland Avenue, Montgomery, Alabama.

With respect to the incident out of which the charge against the defendant arose, Mr. Oliver testified that on April 21, 1964, he went to the house at 3641 Sixth Avenue where his wife lived. They were separated and, Mr. Oliver indicated, there had been an interlocutory decree of divorce. He arrived at about 2 o'clock, having been called by his ex-wife, about an hour or two before, to take his daughter, who had been out of school for about two months, to the school nurse. The door was open; he rang the doorbell and walked in. When he entered he

observed Mrs. Oliver and the defendant embracing and kissing each other. The defendant ran out the back door. Mr. Oliver talked to Mrs. Oliver. In less than a minute the defendant came back, but Mr. Oliver could not remember whether the defendant fired a shot before or after Mr. Oliver saw him on his return. In his hand the defendant had a gun which was pointed at Mr. Oliver. Mrs. Oliver told the defendant to leave and he did so.

On cross-examination, Mr. Oliver testified that the divorce proceeding was pending in Los Angeles County and had reached ''an interlocutory state.'' There had been no court order prohibiting him from going to Mrs. Oliver's premises. When he arrived at Mrs. Oliver's home no one invited him in. The remaining portion of his testimony was: ''Q. You just walked in? A. Well, rang the doorbell and I opened the door. The door was open. I asked where was the kid. Q. How many children do you have? A. Two kids. Q. Where were they at the time? A. I don't know. Q. Were they present in the house? A. Apparently they wasn't, because she said the nurse had picked them up and carried them to the school. Q. At the time you observed your wife and the defendant did you use any profane language? A. None whatever. Q. Did you at any time pick up a knife and attack the defendant? A. I don't even own a knife whatever. Q. Did you pick up a knife that was laying in the house? A. No, I did not. Q. Did you order the defendant to leave the premises? A. No, I did not. I didn't get a chance to say one word to him. He rushed out. Q. Did you kick him at any time? A. None whatever. Q. Had you ever seen him before? A. I have seen him before. Q. You have? A. I have seen him around in the neighborhood before. Q. But you did not know him personally? A. No, I never knew him. Q. Which arm was hit? A. In the left arm. Q. Are you left-handed or right-handed? A. I'm right-handed.''

Lionel Robert, a police officer for the City of Los Angeles, testified that, when he arrived at the Sixth Avenue address at approximately 1:30 p.m. on April 21, 1964, there was blood coming from Mr. Oliver's abdomen, upper left chest and left arm. In his opinion the wounds were gunshot wounds. Mr. Oliver was about 5 feet 11 inches or 6 feet tall and weighed about 185 or 190 pounds. The officer estimated his age to be 38 to 42 years.

Mrs. Oliver, called as a witness by the People, testified that she was the former wife of Mr. Oliver. About April 23, 1965,

she received through the mail a letter in the defendant's handwriting.

Thereupon the trial court permitted the defendant to call Mrs. Oliver as his own witness, out of order. She testified that the duration of her marriage to Mr. Oliver was 25 years. He was 6 feet 1½ inches tall, weighed about 180 or 185 pounds, and was 47 years old. On April 21, 1964, she did not call Mr. Oliver and did not ask him to come to her house. He had assaulted her many times over a period of approximately 15 years. When he was under the influence of liquor he had a violent temper. Twice she had received medical treatment as a result of injuries inflicted upon her by Mr. Oliver.

Mrs. Oliver further testified that on April 21, 1964, the defendant, whom she had known for approximately six or seven months, was living at 3641½ Sixth Avenue with the tenants on her premises. She did not know that Mr. Oliver was coming to her house on that day. At approximately 2 o'clock the defendant appeared and said, "Mrs. Oliver, I came to pay my telephone bill." About two or three minutes later Mr. Oliver came in. She was then in the kitchen washing dishes and was approximately 3 feet away from the defendant. (The trial court stated that the distance in the courtroom indicated by her as being approximately the space between them was a "good deal closer to eight feet.") She was not kissing or embracing the defendant. Mr. Oliver was "under the influence of alcohol and he was raging and using profane language."

Mrs. Oliver further testified that Mr. Oliver told the defendant to get out of his house. As the defendant turned to go through the doorway of the kitchen, Mr. Oliver kicked him in the back and then attacked her, knocking her against the wall. Thereupon Mr. Oliver picked up a knife which was on the kitchen sink. She said, "I'm not afraid of you." Then Mr. Oliver was shot. Upon further inquiry, Mrs. Oliver testified that at the time Mr. Oliver picked up the knife the defendant was in the driveway and Mr. Oliver was facing in the direction of the defendant.

On cross-examination by the People Mrs. Oliver stated that she was so dazed that she did not know what Mr. Oliver did with the knife. It was an ordinary carving knife about 12 inches in length. She heard at least three shots fired by the defendant. She saw a gun in his hand. After the shooting the defendant went out of the house. She further testified that when Mr. Oliver entered her home that day he was "pretty drunk."

Donald Murray, a police officer for the City of Long Beach, testified that on March 16, 1965, he arrested the defendant who said that his name was Angel Ortiz Diamond. After the arrest the officer told the defendant that he had the right to legal counsel and the right to remain silent and that any statement he made could be used in "subsequent hearings." He asked the defendant if he understood what he had explained to him and the defendant replied that he did. He did not tell the defendant that if a sample of his handwriting or certain writings were taken, such matter could be used against him.

James B. Sims, a police officer for the City of Long Beach assigned to the jail division, testified that on March 16, 1965, the defendant completed a handwriting exemplar (exhibit 7) in his presence. He gave the defendant a small yellow card on which it was stated that the person arrested had the right to have an attorney at all times, the right to remain silent, and that anything he said could be used against him. He did not ask the defendant if he could read and he did not ask him any questions about the card. The card was given to him before the exemplar was taken in the course of the booking procedure. He did not tell the defendant that what the defendant wrote on the piece of paper could be used against him. The card had no statement as to whether matter written by the defendant could be used against him.

An examiner of questioned documents for the Police Department of the City of Los Angeles testified that in his opinion a letter (exhibit 6) and envelope (exhibit 6-A) shown to him were written by the same person who had written the handwriting exemplar (exhibit 7) as to which Officer Sims had testified. (Exhibits 6 and 6-A were Xerox copies of the original letter and envelope.) He expressed the same opinion with respect to another letter (exhibit 5) which Mrs. Oliver had testified was in the defendant's handwriting and had been received by her.

Harvey Turrentine, a deputy sheriff of Los Angeles County, testified that on April 21, 1965, he saw the original of the letter (exhibit 6) and of the envelope (exhibit 6-A) in the course of the censoring procedure with respect to outgoing mail of prisoners at the county jail. He made a Xerox copy of the letter and of the envelope and then returned them to the watch commander of the jail section. The Xerox copy of each was mailed to the Los Angeles Police Department.

J. F. Thedens, a police officer for the City of Los Angeles,

testified that he arrested the defendant pursuant to a warrant in the Long Beach city jail on April 13, 1965. At the jail he told the defendant that he and the officer accompanying him were from the Los Angeles Police Department and had a warrant for him, that he had a right to remain silent and a right to have legal counsel, and that anything he told the officers could be used against him in any subsequent court proceedings. He showed a revolver to the defendant. The defendant said, ''I shot the man in self defense and that's the gun I shot him with.'' At that time ''the man'' was not identified in any way.

The records of the Los Angeles County general hospital relating to the injuries sustained by Mr. Oliver were received in evidence. Therein the post-operative diagnosis was stated as follows: ''Gunshot of abdomen, entering through the left flank extending retroperitoneal behind the descending colon and below the left kidney, with no evidence of intraperitoneal bleeding.''

Paul Vaughan, called as a witness on behalf of the defendant, testified that he was a teacher in the Los Angeles school system and taught at a junior high school. He was Mrs. Oliver's brother. In 1964 he saw bruises about Mrs. Oliver's neck, a black eye, scars and scratches about her face. He also saw injuries on her body in 1956 and in 1961. In March of 1964 the witness observed the defendant fixing an electric fixture in Mrs. Oliver's house and he told him that he appreciated his helping Mrs. Oliver from time to time. In March he also told the defendant that if he saw Mr. Oliver on the premises, he should not become involved but should call the witness who would call the police. He informed the defendant that Mr. Oliver had attempted to choke Mrs. Oliver. In 1962 he had called the police when Mr. Oliver was intoxicated. A similar incident occurred in 1963. On cross-examination Mr. Vaughan said that he did not see Mr. Oliver choke Mrs. Oliver, but he saw her after she had been attacked and observed the fingerprints around her neck.

Officer Robert was recalled by the People as a witness in rebuttal. He talked to Mr. Oliver on April 21, 1964, at Mrs. Oliver's house. His face was approximately 2½ feet from Mr. Oliver's face. He did not recall whether he smelled any alcohol. In his opinion Mr. Oliver was sober. When he talked to Mrs. Oliver on that occasion she did not say that she was assaulted or threatened by Mr. Oliver or that he had a knife in his hand or had used the knife in a threatening manner

toward her or any other person. No mention was made of a knife. On cross-examination Officer Robert testified that he did not know the emotional and psychological effects upon a person who has been drinking of the experience of being shot three times.

The defendant did not testify in his own behalf.

█ The evidence as heretofore related was sufficient to sustain the trial court's finding that Mr. Oliver was absent from California at the time of the trial. Mr. Gossett of the district attorney's office testified that a telegram was sent to Mr. Oliver in Montgomery, Alabama, and a reply thereto was received. █ As stated by Justice Vallée in *House Grain Co.* v. *Finerman & Sons,* 116 Cal.App.2d 485, at page 492 [253 P.2d 1034] : "It is settled that a telegram received in reply to a telegram addressed to the sender is presumed to be genuine, and is admissible in evidence without further proof of the identity of the sender. A reply-telegram authenticates itself." (See 7 Wigmore on Evidence (3d ed. 1940) § 2154, p. 615 ; 32 C.J.S., Evidence, § 706, pp. 982-983 ; see *People* v. *Green,* 215 Cal.App.2d 169, 172 [30 Cal.Rptr. 83] ; *People* v. *McDaniel,* 157 Cal.App.2d 492, 499 [321 P.2d 497].) █ Under section 686, subdivision 3, of the Penal Code, a showing of the absence of a witness from the state constitutes a sufficient foundation for the introduction of his testimony given at the preliminary hearing; the due diligence requirement of subdivision 3 of section 686 is inapplicable. (*People* v. *Hanz,* 190 Cal.App.2d 793, 798-799 [12 Cal.Rptr. 282] ; *People* v. *Horn,* 225 Cal.App.2d 1, 4 [36 Cal.Rptr. 898].)

█ The contention that the Sixth Amendment's guarantee of confrontation was denied the defendant is untenable. The record furnishes no enlightenment as to how further preparation on the part of the public defender would have resulted in a substantially more effective cross-examination of Mr. Oliver at the preliminary hearing. There appears to be no rational basis for setting aside the determination of the trial court that at that hearing the defendant was competently represented by the public defender and was afforded adequate cross-examination of Mr. Oliver.

That the circumstances of the present case are decisively different from those before the Court in *Pointer* v. *Texas, supra,* 380 U.S. 400, is evident from the following portion of the opinion (380 U.S., at pp. 406-408) : "Under this Court's prior decisions, the Sixth Amendment's guarantee of confrontation and cross-examination was unquestionably denied

petitioner in this case. As has been pointed out, a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him. [Citations.] This Court has recognized the admissibility against an accused of dying declarations, [citation], and of testimony of a deceased witness who has testified at a former trial, [citations]. Nothing we hold here is to the contrary. The case before us would be quite a different one had Phillips' statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine. [Citation.] There are other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses. The case before us, however, does not present any situation like those mentioned above or others analogous to them. Because the transcript of Phillips' statement offered against petitioner at his trial had not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity to cross-examine Phillips, its introduction in a federal court in a criminal case against Pointer would have amounted to denial of the privilege of confrontation guaranteed by the Sixth Amendment. Since we hold that the right of an accused to be confronted with the witnesses against him must be determined by the same standards whether the right is denied in a federal or state proceeding, it follows that use of the transcript to convict petitioner denied him a constitutional right, and that his conviction must be reversed.'' Unlike the situation in the *Pointer* case, the defendant in the present case was not deprived of his constitutional right of confrontation. (*People* v. *Banks, ante,* pp. 373, 377-378 [51 Cal.Rptr. 398]; *People* v. *Dozier,* 236 Cal.App.2d 94, 100-102 [45 Cal.Rptr. 770].)

    The defendant contends that it was error to receive in evidence the handwriting exemplar (exhibit 7) written at the Long Beach jail and the letter (exhibit 6)[2] intercepted in the course of censoring procedure in the county jail. In the light

---

[2]A part of the letter written by the defendant, which was dated April 21, 1965, was as follows: ''He [Mr. Oliver] after you and me both Susie, thats why we better stick together. If you don't testify that he had that knife, so I'll be acquitted for self defence, The State will indict you after the trial for 'Conspiracy to committ [*sic*] murder and you too will be in trouble. Just remember he was approaching me with a knife, when he was shot. . . . Remember 'The knife,' the Brown handle 'Knife' that you had just washed and laid on the drain board, 'The Knife' He use

of the reasoning of *People* v. *Graves,* 64 Cal.2d 208 [49 Cal.Rptr. 386, 411 P.2d 114], the contention as to the handwriting exemplar is untenable. With respect to the letter, the claim of error is also without merit. ■ As stated in *People* v. *Morgan,* 197 Cal.App.2d 90, at pages 93-94 [16 Cal.Rptr. 838] : "A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment. . . . ■ Officials in charge of prisoners awaiting trial may censor their mail, regulate communications between them and outsiders and under certain circumstances forbid communications between such prisoners and certain classes of visitors. [Citations.]" ( See *Adams* v. *Ellis* (5th Cir. 1952) 197 F.2d 483, 485; *In re Bull* (D. Nev. 1954) 123 F.Supp. 389, 391; *People* v. *Boulad,* 235 Cal.App.2d 118, 126 [45 Cal.Rptr. 104].)

A similar use of correspondence was before the Supreme Court in *Stroud* v. *United States,* 251 U.S. 15, wherein it was said at pages 21-22 [40 S.Ct. 50, 64 L.Ed. 103] : "Certain letters were offered in evidence at the trial containing expressions tending to establish the guilt of the accused. These letters were written by him after the homicide and while he was an inmate of the penitentiary at Leavenworth. They were voluntarily written, and under the practice and discipline of the prison were turned over ultimately to the warden, who furnished them to the district attorney. . . . In this instance the letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process. They came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution. Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure in violation of his constitutional rights."

■ In the review of the evidence to determine whether it was sufficient to sustain the conviction, the law governing this court is that the evidence is to be viewed in the light most favorable to the prosecution. (*People* v. *Gaeta,* 178 Cal.App.2d 830, 832 [3 Cal.Rptr. 384].) ■ The proof required to sustain a conviction of assault with a deadly weapon is that there was an assault, that it was with a deadly weapon, and

to try to kill me with after he kicked me. The 'Knife', the 'Knife', the 'Knife', Knife, 'Knife', Knife, Knife, Knife, the article that will save us. You have your devorce [*sic*] now and you can testify any way that will save me. Just remember the Knife.''

that the defendant intended to commit a violent injury on another. ▆ The intent may be inferred from the doing of the wrongful act. (*People* v. *Corson,* 221 Cal.App.2d 579, 582 [34 Cal.Rptr. 584] ; *People* v. *Sandoval,* 222 Cal.App.2d 348, 351 [35 Cal.Rptr. 227].)

▆ With respect to the subject of self-defense, as aptly stated in *People* v. *Sonier,* 113 Cal.App.2d 277, at page 278 [248 P.2d 155] : ''The justification of self-defense requires a double showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person.''

▆ From the statement of the trial judge in making known his determination as to guilt, it appears that he reached the conclusion that the defendant did not act in self-defense. He stated that he did not believe that Mr. Oliver had a knife in his hand. He indicated that he thought that the defendant obtained the gun after he withdrew from Mrs. Oliver's kitchen and had then unjustifiably renewed the affray. In the performance of his function of determining the credibility of the witnesses, the trier of fact was free to reject the claim of self-defense or of defense of Mrs. Oliver.

The attempted appeal from the order denying the defendant's motion for a new trial is dismissed. The judgment is affirmed.

Shinn, P. J., and Kaus, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 17, 1966.