Filed 4/15/13  P. v. Norris CA1/5
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A131999** |
| **v.** | |
| **CURTIS NORRIS,** | **(Alameda County** |
| **Defendant and Appellant.** | **Super. Ct. No. 161546)** |

Curtis Norris appeals from a judgment of conviction for second degree murder. On appeal, Norris contends the trial court improperly denied his motion to suppress two letters he wrote while in jail awaiting trial, letters that were later used as evidence at his trial.  Norris further contends his trial counsel was ineffective because counsel failed to prevent the jury from seeing and hearing a portion of one of the letters in which Norris referred to the possible sentence he might serve if convicted.  Finally, Norris asserts that the prosecutor committed misconduct in her closing argument by improperly impugning the integrity of defense counsel.

We find none of Norris's contentions persuasive.  Accordingly, we will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We summarize below the facts relating to the crime and Norris's motion to suppress.  Additional facts relevant to the legal issues Norris raises are included in the discussion portion of our opinion.

1

*The Shooting*

On the evening of September 16, 2008, Norris shot and killed Edward Dismukes, who had previously been in custody with Norris in Santa Rita Jail. The shooting took place on 38th Street in Oakland while Norris was riding in a car driven by his girlfriend, Latoya Estrada. While driving on 38th Street, Estrada saw a bicyclist on her left. Norris "said something about all the shit [the bicyclist] was talking in Rita, and then he started shooting . . . ." Estrada and Norris then drove away from the scene.

A police officer who responded to the shooting found Dismukes lying on the ground with injuries to his left chest and right leg and groin area. A subsequent autopsy revealed Dismukes had been shot three times and that the gunshot wounds had caused his death. After the shooting, Norris and Estrada were arrested in San Jose and later turned over to the Oakland police.

*Norris's Statements to the Police*

An Oakland police officer interviewed Norris and advised him of his *Miranda* rights. During the interview, Norris admitted to shooting Dismukes. Norris said he had heard Dismukes had shot appellant's cousin and that Dismukes was talking about "coming after" Norris. Regarding the shooting, Norris told the police Dismukes "wasn't doing nothing but he moved like he was reachin' for somethin' . . . like he was about to grab – when he started grabbin' . . . [I] did my thing." In a separate interview, Norris told the police Dismukes had "made a move like he was going for a gun" and claimed he had shot the victim to protect himself.

*Norris's Letters from Jail*

On December 24, 2008, while awaiting trial, Norris was incarcerated in the Glenn Dyer Jail in Oakland. On that day, Alameda Deputy Sheriff Fred Martinez was working at one of the jail's housing units. Martinez's duties included assisting with incoming and outgoing inmate mail. Under the jail's rules, inmates sending outgoing mail must place their name, personal file number (PFN), and facility address on the outside of the envelope. Outgoing mail that does not have the required sender information is returned to the housing unit for correction.

2

The mail clerk returned a letter to Martinez because the envelope listed only a nickname, "li'l Curt," and no PFN. Martinez opened the letter in an attempt to identify the author. As it had not been signed, Martinez read the contents of the letter, which listed an attorney's name, an upcoming court date, and the charge the letter's author was facing. The letter indicated its author had killed someone, and after reviewing the inmate database, Martinez discovered that Norris was in custody on a homicide charge and that the attorney named in the letter was listed as counsel for Norris. At trial, Martinez read the letter, dated December 27, 2008, and headed "'Keep it Solid,'" to the jury:

"Ricky what's up nigga. What you all niggas been up to. Man it sound like you all niggas been haven hella fun that's what up. Yall niggas be safe out there. What's up with Tim what's his number? What's up with Phil what's that niggas number. You got it? Tell him I need him. Tell Kenny I said what's up with it. Or go to Ream house and get his number. Tell him I said I wanna write him. Man my visiting hours is Fridays at 12:00 to 3:00 and on Sundays at 8:00 to 12:00. Man yall niggas need to come up here fast. What's the name of the song yall did? An tell Deas I need a burn out. I seen that nigga Curt when I went to court. It's good. He cool. He said yall had some burn out's on line. What's up with that nigga pee wee. What they doin with him. Or you got a cell phone yet if you do what's yo number so I could call you. I seen that nigga Jose. He was on the other side I don't know if he still there tho. But shit tell Phil I need him to call my attorney and tell him, number one, the dude Mike I killed was the same dude who shot Phil.

"Number two. The way he no is because when I got out and Phil got shot he told me Mike name and described him to me and we knew we was talkin about the same person.

"Number three. The way Phil described him was dark skinned, short hair, and his late 30s or 40s and slim.

"Number four. If he ask make up a story of how yall had got into it that made him shoot Phil.

3

"Five. Explain to him the same way you got shot when you was with Fresh. Don[']t fuck up . . . tell Phil if he don't make that call it's going to be over 4 me. So be on that nigga lied about that. Read this paper off to him word 4 word. I go back to court on March 3, 2009.

"These are the things I need Phil to tell my attorney. Tell him he an[d] got to get on the stand. I just need him to talk to my attorney. Tell him to call him at 510 272-6600[.] His name Roger Spencer. Tell Phil I need him to do this fo me and I'll be good. I'll be back. Tell that nigga I love him and be safe out there. Yall niggas scanless talkin about when I got burnt by that burn out bitch fuck yall niggas LOL it's good tho. Bra send me some pictures and tell Deas I said I heard he got a nickel with two of them thangs. That's whats up. Get active. Which when I come home its all be good. Nigga go be all tated up 96 to 10-6.

"If Ceat got a number send it to me. Send me yall niggas numbers. Tell Phil to handle asap.

"Love you Bra. Gone. What's Tae number?"

Martinez generated a report to document how he had come into possession of the letter. Because he thought the letter had evidentiary value, Martinez contacted the Oakland Police Department's homicide division as well as the prosecutor handling the case and notified them of the letter's contents.

On January 13, 2009, Sheriff's technician Karen Stirling opened a letter Norris had given her and gave it to her supervisor, who turned it over to Martinez. The envelope was addressed to Phil Willson and listed Norris as the author but did not include a PFN. At trial, Martinez read a redacted version of the letter to the jury:

"Bra what's up with it? Me been keeping my head up. I think that nigga cell was in here, but it C pod. I'm in A. [. . .] I was tryna see if we go on a visit together an I was go see what's up. That nigga gone now. Yea man I'm tryna see if I can get 15 years or something around it. The little hoe bitch tellin on everything I did with her around me. So man I'ma be down 4 aimin you niggas keep it solid and be safe. Get money. But yea I need you to do me a favor. I need you to call my attorney and holla at him 4 me. Man

4

this shit would help my base hella much. I need you to tell him. One. The nigga name is Mike. Two. Tell them that's the nigga who shot you.

"Three. Explain it the same way it happen with you and fresh.

"Four. If he ask what he look like say dark skinned slim cat in his late 30s early 40s. 150 to 170 pounds. Short hair.

"Five. If he ask how do you know it's the same dude? Say after you got shot, you explain how he looked and told me his name when I got out of jail and we knew it was the same person.

"Six. If he ask how yall got into it, just make up something or say you rather not talk about it.

"Man I know this sound [cra]zy but my case is really in your hands.
[. . .]

"You tell him that it would make better on me hella much. I told the people I was scared coz he shot you and at that time, when I seen him he went reachin for something and I knew it was a gun so I shot him before he shot me. That's like a manslaughter.
[. . .]

"A manslaughter time goes from three, six, 11 years. So I need you. I would take 15 years right now and be back in 13 plus the time I got in. Man on my moma I'ma o you a big ass favor. Bra write me back and let me know what's up if you called him and what happened. Man I need that fast. I go back to court I think on the 3-3-09 and I'ma see what's up. These people tryna rush me and that bitch is probly go get on the stand and point me out, but I'm hoppen they come at me with a good deal if not they have to give what time I ant taken and in with and L on it. Feel me. But yea holla at me and let me know what's up. Tell that nigga D I said keep his head up and be safe out there when he get out. Bra be safe out there I ant tryna see you in here. And send some pictures I need them. I'ma be gone 4 a min. Keep it solid love yall nigga gone . . . My attorney name and number is Roger Spencer (510) 272-6600. Be on yo feet before you holla at him. Think this shit through.

"[. . .] Lil Curt."

5

*Norris's Motion to Suppress the Letters*

Defense counsel moved in limine to suppress the two letters. The defense argued that while there is no expectation of privacy in prison, there is such an expectation in jails. Defense counsel also argued there was no need for institutional security for inmates' outgoing mail. Norris's counsel contended that standard sheriff's office practice is to have the inmate seal his letter before giving it to a sheriff's office employee – "[t]he mail is not normally subsequently reopened and read or anything like that." According to defense counsel, a policy allowing inmates "to seal their own mail without having anyone read it, the mail goes out and mailed to the people on the outside, certainly creates an expectation of privacy in that there would be a belief that the mail is not going to be read because it's not given to the sheriff's office unsealed."

After rejecting the prosecution's argument that Norris lacked standing to contest the search, the trial court held a hearing on the motion to suppress. At the hearing, Deputy Martinez testified that he was assigned to the Glenn Dyer Jail in Oakland in 2008. His duties in the housing unit included handling correspondence. He testified that the jail's rules regarding correspondence by inmates dictate the manner in which envelopes are marked. The jail's "Inmate Rules and Information" pamphlet, section 16, subsection (z), states that "outgoing mail must include the author's name, their PFN or personal file number, and the facility return address." The inmates are told of this requirement.

On the morning of December 24, 2008, Martinez was collecting mail from inmates. He "came across a letter that had been returned by the mail clerk because it had not – the send information had not been included on the letter or on the envelope." The return address simply said, "Lil Curt." The mail clerk had written on the envelope, "no name, no PFN." Martinez opened and reviewed the letter to "try to identify the sender to have them correct the envelope."

Martinez reviewed the computer listing of inmates assigned to the housing area for any inmates named Curt or Curtis. The letter also contained an attorney name and an upcoming court date, which helped Martinez identify Norris as the author of the letter.

6

Seeing that Norris was charged with murder, Martinez notified the Oakland Police Department's homicide division, the deputy district attorney, and his classification officer. Martinez believed the letter was pertinent to the investigation because the letter's author acknowledged having killed someone, instructed the intended recipient to contact the author's attorney, and the letter seemed to contain "instructions to fabricate an explanation or outline for the actions of the author."

A few weeks later, Martinez received a second letter, authored by Norris and addressed to Phil Willson, which had been recovered on the jail's administrative floor. The envelope of this second letter listed the name "Curtis Norris," but did not list appellant's PFN. Martinez said the second letter appeared to instruct the recipient to contact the author's attorney and directed the recipient to provide an alibi. Martinez then generated a brief report about the second letter.

After hearing argument from counsel regarding the first letter, the trial court ruled it admissible. It held that Norris's incarceration limited any expectation of privacy he might have, and while the rule permitting inmates to seal their outgoing mail created a limited expectation of privacy, that expectation was conditioned upon compliance with the institution's rules governing mail. If a letter violated those rules, then the inmate ran the risk that the sheriff's office would open the letter in an attempt to identify its author. The court therefore denied the motion to suppress as to the first letter, but it continued the hearing to take further evidence before ruling on the admissibility of the second letter, since that letter did have Norris's name on it.

At the continued hearing, Deputy Jose Rosas, who worked in the Glenn Dyer Jail's classification unit, testified that he screened incoming and outgoing mail. When inmates are booked into jail, they are given a rules and information pamphlet. Section 16, subsection (i) of that pamphlet states that "[a]ll mail will be opened and inspected for contraband." Subsection (z) states that "all outgoing mail must have a name, PFN number and return address of the inmate. If the mail is returned to jail without a name and PFN, it will be destroyed."

Both ingoing and outgoing mail is inspected for contraband. According to Rojas, "Everything gets opened, unless it's legal mail." Policy and procedure 17.01, which explains the procedure for inmate correspondence and mail, states that "[a]ll outgoing mail will be opened and read by staff if it is deemed necessary to preserve jail security." Rojas also testified that the Alameda County Sheriff's Office follows the California Code of Regulations' Minimum Jail Standards for Detention and Correction which explain that all nonconfidential inmate mail is subject to being read in its entirety, although inmates are not given copies of these regulations. Rojas explained that the standard procedure is to open the inmates' sealed letters before mailing them in order to determine whether jail security is a concern.

Sheriff's technician Karen Stirling worked in the classification unit and her duties included recording inmate conversations and screening incoming and outgoing mail. Her training was to open "incoming and outgoing mail" to "scan the contents of the mail for contraband coming in or evidence, criminal activity or outgoing criminal activity going on from within the jail." Stirling testified that all outgoing mail goes to the classification unit before it is sent to the postal service. Outgoing mail is "randomly screened," meaning the mail is opened and its contents read. Some mail is randomly selected, but other mail is screened on request. The purpose is "to investigate possible ongoing criminal activity from within the jail." Stirling scans the letters, i.e., "quickly read[s] them." If she encounters a letter evidencing criminal activity, Stirling gives it to her supervisor. After Stirling read Norris's second letter, she gave it to her supervisor, because she was unsure whether a police report should be generated. She thought a report might be necessary because the letter "addressed some specific crimes[.]"

After argument from counsel, the trial court denied the motion to suppress. Returning to Norris's first letter, the court noted that it had no name or PFN on the envelope and that any privacy right he might have had was lost because the letter did not comply with the jail's rules and regulations. The court found the sheriff's office acted in good faith when it opened the letter to ascertain its author, which led to the discovery of incriminating evidence. The court noted that section 16, subsection (i) of the inmate rules

8

pamphlet states that "all mail will" be opened, which lets inmates know their mail would be opened. This rule, together with the Alameda County Sheriff's Office policies on incoming and outgoing mail were sufficient to put inmates on notice that their mail was subject to being opened. The court also noted that it was clear that outgoing mail is searched randomly and that such searches included reading of the mail. As a consequence, Norris received adequate notice that he had no expectation of privacy in the contents of his letters.

*Trial and Conviction*

After a jury trial, Norris was convicted of second degree murder with enhancements for personally and intentionally discharging a firearm and causing great bodily injury and death, intentionally discharging a firearm, and personally using a firearm.

On April 29, 2011, the trial court sentenced Norris to 40 years to life in state prison. Norris filed a timely notice of appeal on May 9, 2011.

DISCUSSION

Norris raises three arguments on appeal. First, he contends the trial court erred in refusing to suppress the letters he wrote from jail. Second, he claims his trial counsel provided ineffective assistance by failing to prevent the jury from seeing unredacted versions of the letters after the trial court had ordered their partial redaction. Third, he argues the prosecutor committed misconduct by allegedly asserting defense counsel was attempting to fabricate a defense to the charged crimes. We address these arguments in turn.

I.     *Norris's Letters Were Properly Admitted.*

Norris challenges the trial court's denial of his motion to suppress the letters he wrote from jail, claiming it erred in finding that government officials did not search and seize his letters without due process.[1] While Norris's brief is not a model of clarity, he

_____

[1] Although the heading of this argument in Norris's brief characterizes this as a due process claim, Norris discusses only authorities dealing with the Fourth Amendment's protection against unreasonable searches and seizures. (See U.S. Const., 4th Amend.

9

appears to make a two-pronged argument. First, relying principally on the California Supreme Court's decision in *North v. Superior Court* (1972) 8 Cal.3d 301 (*North*), he contends that a combination of misleading regulations regarding inmate mail and actions by jail staff gave him a reasonable expectation of privacy in his written communications. Second, citing the United States Supreme Court's opinion in *U.S. v. Jones* (2012) 132 S.Ct. 945 (*Jones*), he asserts that jail officials trespassed upon property protected by the Fourth Amendment (i.e., his "papers") without first obtaining a warrant. In his reply brief, Norris clarifies that while *Jones* did not discuss how "courts should assess application of any rules that may pertain to the actual execution of warrantless searches," the significance of *Jones* is that it shows Norris "did have a protected Fourth Amendment right because his papers were seized." As we will explain, both of Norris's arguments are foreclosed by controlling authorities from our federal and state high courts.

        A.      *Norris Had No Reasonable Expectation of Privacy in His Letters.*

Norris contends he had a reasonable expectation of privacy because the jail's rules regarding inmate mail were ambiguous and because he never received notice of any regulation stating that his outgoing mail might be opened and read. In addition, he asserts that jail officials had a practice of informing inmates if their letters were not deliverable and returning undeliverable letters to inmates. Because of this combination of ambiguous regulations and informal practices, Norris was allegedly "lulled into believing" his outgoing mail would not be opened and read. (*North, supra,* 8 Cal.3d at p. 311.) We cannot agree.

Although neither party cites the cases, we conclude that two opinions of the California Supreme Court dispose of this argument. In *People v. Phillips* (1985) 41 Cal.3d 29 (*Phillips*), the court considered a defendant's claim that jail officials had violated his Fourth Amendment rights by inspecting two letters he had written in jail while awaiting trial. (*Id*. at pp. 75, 80.) Relying on *North, supra,* 8 Cal.3d 301, the

---

["The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . ."].) We will therefore address only the Fourth Amendment issue.

10

defendant claimed "that jail officials lulled him into a 'sense of pseudoprivacy,' by informing him that his outgoing mail would not be inspected." (*Phillips, supra,* 41 Cal.3d at p. 80.) The Supreme Court rejected this argument on facts significantly more favorable to the defendant than those presented by this case.[2] It conceded that jail officials had given "ambiguous" answers to the defendant's questions about the monitoring of mail, but it declined to characterize those statements as giving rise to a reasonable expectation of privacy. (*Id.* at pp. 80-81.) The court further rejected the analogy to *North,* explaining that in the latter case, it had "condemned a '*deliberate*' scheme to 'secretly exploit [] marital confidences . . . for the sole purpose of gathering possibly incriminating evidence.'" (*Id.* at p. 81.) If the facts in *Phillips* were insufficient to create a reasonable expectation of privacy in the detainee's outgoing mail, the facts here are even less so.

In *People v. Davis* (2005) 36 Cal.4th 510 (*Davis*), our state Supreme Court held that the surreptitious tape recording of a jailhouse conversation between a pretrial detainee and two accomplices did not violate the Fourth Amendment. Relying on *Hudson v. Palmer* (1984) 468 U.S. 517 (*Hudson*), the court held that "persons held pretrial in a jail . . . have no expectation of privacy . . . ." (*Davis, supra,* 36 Cal.4th at p. 527.) As the *Davis* court explained, "it is '[t]he fact of *arrest* and incarceration [that]

---

[2] The Supreme Court found no Fourth Amendment violation despite the following facts: "It is undisputed that defendant was not informed that his outgoing mail was being read. Moreover, the manual prepared for inmates by one of the jail officials, which summarized the jail rules and regulations, apparently stated without qualification that outgoing mail was not monitored. However, the regulations apparently provide that, while outgoing mail is not ordinarily monitored, it may be inspected (without notice to the detainee) if there is some affirmative indication that the inmate presents a security problem. The jail administrative officer explained that defendant's letters were read because he was classified as 'dangerous' and an 'escape risk.' Furthermore, he testified that defendant asked him whether outgoing mail was monitored, and the administrator replied that 'under normal conditions' it was not. The administrator nonetheless reminded defendant of an occasion when the jail captain had testified in a homicide case regarding the contents of a letter written from jail. For a definitive answer to his question, the officer referred defendant 'to his rules and regulations.'" (*Phillips, supra,* 41 Cal.3d at p. 80.)

abates all legitimate Fourth Amendment privacy and possessory interests in personal effects [citations] and therefore all searches and seizures of the contents of an inmate's cell are reasonable.' (*Hudson, supra,* 468 U.S. at p. 538 (conc. opn. of O'Connor, J.), italics added.)" (*Davis, supra,* 36 Cal.4th at p. 527.)

Significantly, the *Davis* court also made clear that *Hudson's* rationale extended to jailhouse searches regardless of the purpose of the search. (*Davis, supra,* 36 Cal.4th at p. 527.) The purpose of the search "has no bearing on the question whether a legitimate expectation of privacy exists." (*Id*. at p. 528.) Instead, "[i]t is the fact that an intrusion *may occur,* not the reason for the intrusion, that vitiates the expectation of privacy."[3] (*Ibid*., italics added.) Although the court acknowledged that at the time the search in *Davis* occurred, state law prohibited the recording of a pretrial detainee's conversations with other detainees (*id.* at pp. 527-528), it held that even if the detainee could reasonably have expected that the police would not violate state law by monitoring his conversations, "that expectation was basically irrelevant to the Fourth Amendment question." (*Id*. at p. 528.)

Applying the analysis of these cases to the one before us, it is readily apparent that Norris can have had no reasonable expectation that his outgoing mail would remain private. *Davis* held flatly that pretrial detainees have no expectation of privacy in jail. (*Davis, supra,* 36 Cal.4th at p. 527.) As the trial court found, the rules pamphlet Norris received and the jail's policy on incoming and outgoing mail made him aware that his mail might be opened. Indeed, the rules pamphlet states unequivocally, "*All mail* will be

---

[3] Even if the reason for the search were relevant to the inquiry, we note that Norris's first letter was opened because it admittedly failed to comply with jail regulations requiring that all outgoing mail contain the name, PFN, and return address of the inmate. The second letter appears to have been opened as part of the jail's random screening of prisoner mail for evidence of criminal activity. Norris does not contend that jail officials may not open noncompliant mail, and he does not address Stirling's testimony concerning the jail's practice of random screening. (Cf. *Procunier v. Martinez* (1974) 416 U.S. 396, 413 ["Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters . . . containing other information concerning proposed criminal activity, whether within or without the prison."].)

12

opened and inspected for contraband." (Italics added.) Accordingly, Norris was aware "that an intrusion may occur," a fact that "vitiate[d] the expectation of privacy." (*Davis, supra,* 36 Cal.4th at p. 528; see also *People v. Garvey* (1979) 99 Cal.App.3d 320, 323 [save for communications to attorneys or public officials, "a prisoner has no expectation of privacy with respect to letters posted by him"]; *People v. Manson* (1976) 61 Cal.App.3d 102, 152 [noting general rule that mail authored by unconvicted prisoners may be admitted if obtained "by means of routine mail censorship"]; *People v. Dinkins* (1966) 242 Cal.App.2d 892, 902 [prison officials may censor mail of prisoners awaiting trial].)

Nor could the alleged ambiguity of the jail's rules or the actions of the jail's officials have created any such expectation. (See *Phillips, supra,* 41 Cal.3d at pp. 80-81.) Indeed, even if Norris "may have been inadvertently misled to believe that his letters would pass unread," the inspection of his mail would not have been unreasonable because there is no evidence that jail officials acted in bad faith or exceeded the scope of their authority under the regulations. (*Id*. at p. 81.) In the absence of any affirmative representations that would mislead Norris into thinking his mail would remain private, he cannot make out a Fourth Amendment claim. (*Ibid*.; see *North, supra,* 8 Cal.3d at p. 312; cf. *People v. Hammons* (1991) 235 Cal.App.3d 1710, 1716 [recording of jailhouse conversation between pretrial detainees should have been suppressed where "the police led defendants to believe that they would have a private conversation, and . . . the police in fact made an express representation of privacy"].)

B. *Jones Does Not Assist Norris.*

Before turning to the merits of Norris's argument based on *Jones, supra,* 132 S.Ct. 945, we note that his opening brief does not tell us exactly what effect he thinks *Jones* should have on our analysis. His brief states it is "arguable" that analyzing his Fourth Amendment claim "under the 'reasonable expectation of privacy' test formulated by Justice Harlan in his concurring opinion in *Katz* [*v. United States* (1967) 389 U.S. 347] *may be* outdated and unnecessarily complicated." (Italics added.) This equivocal statement is followed by an argument headed, "New Development in Fourth Amendment

Jurisprudence." But such general headings do not satisfy the appellate rules requiring separate headings summarizing an appellant's argument. (See *Loranger v. Jones* (2010) 184 Cal.App.4th 847, 858, fn. 9 (Cantil-Sakauye, J.) [general argument headings like "Statutory Analysis" and "Case Analysis" do not satisfy requirements of Cal. Rules of Court, rule 8.204(a)(1)(B)].) Norris then claims that accepting the "broad principle that incarcerated people do not have a reasonable expectation of privacy while in jail" is "just the sort of narrowing of the scope of the Fourth Amendment . . . the Supreme Court repudiated in *Jones*." Whatever effect *Jones* may have on Fourth Amendment jurisprudence, however, that case did not purport to overrule cases such as *Hudson, supra,* 468 U.S. 517, and Norris makes no effort to reconcile *Jones* with these authorities.

In any event, we conclude that *Jones, supra,* 132 S.Ct. 945 does not assist Norris here. As we recently explained in *People v. Robinson* (2012) 208 Cal.App.4th 232 (*Robinson*), *Jones* "held that a search also occurs where a government official physically intrudes in a constitutionally protected area for the purpose of obtaining information." (*Robinson, supra,* 208 Cal.App.4th at p. 243, fn. 11.) Norris contends he had a protected Fourth Amendment right in his letters, but as discussed in the preceding section, the California Supreme Court has disagreed. Under *Davis,* Norris's arrest and incarceration "'abate[d] all legitimate Fourth Amendment privacy *and possessory* interests in personal effects[.]'" (*Davis, supra,* 36 Cal.4th at p. 527, italics added.) To the extent Norris appears to claim he suffered a common law trespass to his property, it is difficult to understand how this can have occurred if his status as a detainee deprived him of any legitimate possessory interest in it. (See *ibid*.)

Furthermore, *Jones* is factually distinguishable from the case before us because it did not arise in the context of incarceration. This is significant because "the United States Supreme Court has 'made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, . . . or the like, [it] has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' [Citation.]" (*Robinson, supra,* 208 Cal.App.4th at p. 246, fn. omitted.) Incarceration involves just such special law

14

enforcement needs and diminished expectations of privacy. (See *Hudson, supra,* 468 U.S. at p. 528 [prisoner's expectation of privacy "always yield[s]" to special need for institutional security in prisons]; *Davis, supra,* 36 Cal.4th at p. 527 [security concerns negate inmates' expectation of privacy].)

*Jones* did not overrule, either explicitly or implicitly, cases such as *Hudson,* and Norris does not argue that such cases are not controlling. Tellingly, Norris makes no response to the Attorney General's argument—based on *Hudson* and earlier California cases—that prisoners have no expectation of privacy in their mail. Indeed, Norris does not even cite these cases. Thus, "[s]ince appellant has not deigned to reply to the argument of respondent, we have a right to assume that the former deems the argument of the latter unanswerable[.]" (*Campbell v. Ingram* (1918) 37 Cal.App. 728, 732.) Accordingly, we reject Norris's argument that *Jones* required the jail's officers to obtain a warrant before searching his outgoing mail.

II.     *Norris's Claim of Ineffective Assistance of Counsel Fails Because He Cannot Demonstrate Prejudice.*

Norris argues his trial counsel was ineffective for failing to prevent the jury from receiving unredacted versions of his letters that contained other crimes evidence and sentencing information.[4] We conclude that this claim fails because Norris has not demonstrated he was prejudiced.

A.     *Factual Background*

After the trial court ruled Norris's letters were admissible, it noted that there were parts of the letters that would have to be redacted. It referred specifically to a portion of Norris's second letter in which he mentioned "shooting somebody else and chasing somebody[.]" The court explained this would have to be redacted as uncharged character act evidence, and defense counsel agreed.

The prosecution asked Deputy Martinez to read the second letter to the jury. Before he did so, the trial court explained to the jury that there were redactions in the

_____

[4] Although the heading of Norris's argument refers to other crimes evidence, his brief addresses only the issue of sentencing information. We therefore confine our analysis to the latter issue.

15

letter and that the jurors should not speculate as to why the court had ordered certain portions redacted. Martinez read the redacted letter to the jury, and while it omitted the statements about uncharged acts, the version he read included a passage in which Norris had written, "[S]o I shot him before he shot me. That's like a manslaughter . . . . A manslaughter time goes from three, six, 11 years. So I need you. I would take 15 years right now and be back in 13 plus the time I got in." Defense counsel did not object.

At a later conference at which the trial court and counsel discussed exhibits, the trial court explained that defense counsel objected to the phrase in the second letter "related to the state prison exposure for manslaughter." The trial court ordered that the phrase, "A manslaughter time goes from three, six, [11] years," and defense counsel agreed to this redaction. A copy of the letter containing both the original redactions and this further redaction was created and received in evidence as People's exhibit 4C.[5] The jury requested this exhibit during its deliberations.

B. *Standard of Review*

On appeal, it is Norris's burden to demonstrate, by a preponderance of the evidence, that he is entitled to relief on the grounds of ineffective assistance of counsel. (E.g., *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) To do so, he must show that: (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) he was prejudiced by the deficient performance. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Defendant's burden is difficult to carry on direct appeal (*People v. Vines* (2011) 51 Cal.4th 830, 876), because the trial record often does not indicate why trial counsel acted or failed to act in the manner he did. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.) And we may not reverse a

---

[5] Norris asserts that both the redacted and unredacted versions of the second letter were received into evidence, but the record is less than clear on this point. The reporter's transcript of proceedings on January 11, 2011 reflects that both the unredacted and redacted versions of Norris's second letter were "received in evidence." The exhibit record indicates that two redacted versions of the letter—People's exhibits 4B and 4C— were admitted in evidence on January 12. The clerk's minutes for the same day show only that People's exhibit 4C was admitted into evidence.

16

conviction for ineffective assistance of counsel on direct appeal unless the record affirmatively discloses that counsel had no rational tactical purpose for his act or omission. (*People v. Vines, supra,* at p. 876.) Where the record sheds no light on the issue, we must affirm unless there could be no conceivable reason for counsel's act or omission. (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) Furthermore, our review of trial counsel's performance is deferential (*People v. Ledesma, supra,* at p. 216), and there is a strong presumption that counsel's actions fell within the wide range of reasonable professional assistance. (*People v. Lucas, supra,* at p. 437.)

Nevertheless, "we need not dwell on the question whether defendant can establish deficient performance by his trial counsel" if he cannot establish prejudice, "that is, a reasonable probability of a more favorable outcome in the absence of the assertedly deficient performance." (*People v. Stewart* (2004) 33 Cal.4th 425, 495.) In other words, we ask "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citation.]" (*In re Cudjo* (1999) 20 Cal.4th 673, 687.) To meet this burden, a defendant must prove prejudice that is a demonstrable reality and not simply speculation. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

C.     *Norris Was Not Prejudiced by His Trial Counsel's Error.*

The parties agree that there could have been no legitimate tactical reason for Norris's trial counsel to acquiesce in the admission of the unredacted letters. Thus, the only question before us is whether Norris was prejudiced by his counsel's error. The Attorney General argues he was not, and thus his claim of ineffective assistance of counsel must fail. We agree.

First, while it is ordinarily improper for the jury to hear information about sentencing, it is also "generally presumed that erroneous admission of [such] evidence is cured by instructing the jury to disregard it, unless the impression created is so strong as to have prejudiced the defendant." (*United States v. Reagan* (7th Cir. 1982) 694 F.2d 1075, 1080.) Here, the trial court instructed the jury, "In your deliberations, do not discuss or consider the subject of penalty or punishment. That subject must not in any

17

way [a]ffect your verdict." We must presume the jury understood and followed this instruction. (*People v. Jackson* (1986) 177 Cal.App.3d 708, 714 [jury presumed to follow instruction that it not consider penalty or punishment for crime].)

Second, Norris argues he was prejudiced because any juror who harbored some reasonable doubt about whether he shot as a pure act of violence rather than in an unreasonable belief that he needed to defend himself would have been persuaded to convict him of the greater crime of murder rather than grant him the lighter sentence for manslaughter. We agree with the Attorney General, however, that the evidence that Norris committed murder was extremely strong, while the evidence supporting his claim of self-defense was extraordinarily weak.

Norris shot Dismukes multiple times while yelling at the victim, "This is for the shit that you said at Rita." Norris told Estrada he shot Dismukes because the latter "was talking hella shit in . . . Santa Rita." In his interview with the police, Norris admitted that while the two men were in Santa Rita, Dismukes "was trying to pick on" him and that the two had almost gotten into a fight. After the shooting, Norris fled the scene of the crime, and when he was found in San Jose, he gave a false name to the police. He took the bullet shells from the floor of Estrada's car and threw them away in his backyard, and he attempted to conceal the gun used in the shooting in the motel room in which he was discovered. He told Estrada he was "dumpin' [the gun] because he had shot somebody."

In contrast, the only evidence for Norris's claim of self-defense were his own statements to Estrada and to the police that he had seen Dismukes reaching for his waistband. Estrada contradicted this testimony, however, and told the police she did not see Dismukes carrying or reaching for a weapon or displaying any aggression towards Norris.[6] Moreover, the portions of Norris's letters to which no objection is made

---

[6] At trial, the jury was shown video footage taken on the night of the shooting by an adjacent restaurant's surveillance camera. The Attorney General contends the video footage did not show Dismukes reaching for his waistband. In his reply brief, Norris argues the footage was not clear. Although this court granted requests to augment the record on appeal with certain exhibits entered in evidence below, the video shown to the jury is not among the exhibits the parties have transmitted to this court.

18

provided powerful evidence that Norris fabricated his claim that Dismukes had shot his cousin, which was allegedly the reason Norris feared the victim might harm him. In fact, in his reply brief, Norris acknowledges that his letters contained "what could be read as attempts . . . to fabricate a self-defense claim." Thus, as Norris all but admits, his own words undermined his argument that he feared Dismukes because he believed Dismukes had shot his cousin.

The above-described evidence makes the case before us unlike those Norris cites in support of his argument. Norris relies principally on *People v. Allen* (1973) 29 Cal.App.3d 932 (*Allen*) for the proposition that in criminal cases, improper references to penalty or punishment are generally held to be reversible error. (*Id.* at pp. 936-937.) In that case, a jury had found the defendant was a mentally disordered sex offender. (*Id*. at p. 933.) In the trial court, the prosecutor had referred repeatedly to the treatment the defendant might receive if the jury found him to be a mentally disordered sex offender, raising the matter during jury voir dire, during the examination of psychiatric witnesses, and in closing argument. (*Id*. at p. 934.) The trial judge also joined the prosecutor in referring to the treatment the defendant could receive. (*Id*. at pp. 934-935.) The Court of Appeal characterized the evidence on the issue of whether the defendant was a mentally disordered sex offender as "close." (*Id*. at p. 934.) Here, in contrast, the evidence was not close, and unlike the trial judge in *Allen,* the trial judge here made no reference to the sentence Norris might serve and instead instructed the jury that it was not to consider the issue of punishment in reaching its verdict.

---

In criminal appeals, exhibits admitted in evidence are deemed part of the record, but they may be transmitted to the reviewing court only as provided in California Rules of Court, rule 8.224. (Cal. Rules of Court, rule 8.320(e).) Our docket does not show that Norris designated the video exhibits for transmission to this court. (Cal. Rules of Court, rule 8.224(a)(3).) Norris had a responsibility to put before this court every part of the record cited to support his claims on appeal. (Cal. Rules of Court, rules 8.360(a), 8.204(a)(1)(C); cf. *People v. Coley* (1997) 52 Cal.App.4th 964, 972 [appellant bears burden of perfecting the appeal and showing error and resulting prejudice and must move for order to reconstruct lost exhibit as a prerequisite to asserting error].) In light of the strength of the other evidence supporting Norris's conviction, we need not address the parties' dispute over what the video showed.

We therefore reject Norris's claim of ineffective assistance of counsel because he has failed to demonstrate he was prejudiced by trial counsel's error. Our review of the evidence shows there is no reasonable probability he would have received a more favorable outcome in the absence of his counsel's deficient performance.

III.    *The Prosecutor Did Not Commit Misconduct.*

Norris claims the prosecutor committed misconduct in her rebuttal argument. He argues the prosecutor attacked the integrity of defense counsel by effectively accusing the latter of dishonesty. We disagree.

A.    *Factual Background*

After closing argument for the defense, the prosecutor gave her rebuttal. At the beginning of her rebuttal argument, the prosecutor stated: "One of the most difficult jobs for a criminal defense attorney is they're basically playing with the hand they are dealt with. And when there is a lot of evidence, overwhelming evidence, they have to somehow twist . . . ." Defense counsel objected that this was improper argument, but the trial court overruled the objection.

The prosecutor then continued, "And in this case, that's exactly what we have here. We have overwhelming evidence that defendant committed murder. And Mr. Spencer needs to somehow make it a little better, but he's not a magician. He can't go back in time and change the facts. The facts are what they are. The facts are what they are. [¶] So instead, they have to try to come up with some sort of a defense. No matter how unreasonable it is, they have to. And this is exactly what Mr. Spencer is trying to do." Defense counsel objected again and was again overruled.

The prosecutor finished her rebuttal argument by telling the jury, "[Norris is] trying to ask [you] for a favor. Do not give him a favor. He does not get a favor. Do not give him a manslaughter. Don't give him that favor." Defense counsel did not object to this final portion of the prosecutor's argument.

B.    *Analysis*

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct,

20

and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial."  (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

But a prosecutor enjoys "wide latitude in describing the deficiencies in opposing counsel's tactics and factual account."  (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Thus, the prosecutor may "point out that the opposing side is engaging in what [she] believes to be an attempt to confuse the issues, and may urge the jury to ignore that attempt and focus on the relevant evidence."  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 31-32.)  This is all that occurred here.  Indeed, our state high court has consistently rejected misconduct claims when confronted with comments similar to those made by the prosecutor in this case.  (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 207 [fair comment and not misconduct for prosecutor to argue: "'Now, [defense counsel] has a tough job, and he tried to smoke one past us,' and that counsel 'will admit only what he has to admit and no more.  He will come in at the lowest price possible'"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1002-1003 [no misconduct where prosecutor said defense counsel's "'job is to put up smoke, red herrings'"]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1215-1216 & fn. 12 [no misconduct where prosecutor argued defense counsel was talking out of both sides of his mouth and that this was "'great lawyering' which "'doesn't change the facts, it just makes them sound good'"]; see also *People v. Valladares* (2009) 173 Cal.App.4th 1398-1399 [no misconduct where prosecutor began rebuttal by twice characterizing defense argument as a "smoke screen" and calling defense counsel's argument about defendant's intent "fantastic"].)  Here, the prosecutor did no more than "use[] colorful language to permissibly criticize counsel's tactical approach."  (*People v. Huggins, supra,* 38 Cal.4th at p. 207.)  Because we conclude that no misconduct occurred, we reject Norris's claim.

DISPOSITION

The judgment is affirmed.

21

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Needham, J.